**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ANTONIO SIMOES, | : | CIVIL ACTION NO. 09-3498 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| NATIONAL RAILROAD PASSENGER | : |  |
| CORPORATION, et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**COOPER, District Judge**

Plaintiff, Antonio Simoes, brings this action against
defendants, National Railroad Passenger Corporation ("Amtrak")
and Commercial Cleaning Corporation ("CCC"), for personal
injuries that occurred at Amtrak's Adams Station Maintenance
Facility (the "facility").  (Dkt. entry no. 12, Am. Compl.)
Count One asserts a cause of action for negligence against
Amtrak, plaintiff's employer at the time of the incident,
pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51
et seq.  (Am. Compl. at ¶¶ 11-17.)  Count Two asserts a cause of
action under state law for negligence against CCC, the provider
of janitorial and maintenance services at the facility.  (Id. at
¶¶ 18-24.)

Amtrak asserts cross-claims against CCC for (1) common law
indemnity and contribution, and (2) contractual indemnity.  (Dkt.

entry no. 22, Amtrak Ans. & Cross-cl.)[1]  Amtrak now moves for
summary judgment in its favor on its cross-claim against CCC for
contractual indemnity, pursuant to Federal Rule of Civil
Procedure ("Rule") 56.  (Dkt. entry no. 32, Mot. for Summ. J.)
CCC opposes the motion.  (Dkt. entry no. 34, CCC Br.)  The Court
decides the motion on the papers without oral argument, pursuant
to Rule 78(b).  The Court, for the reasons stated herein, will
grant in part and deny in part the motion.

**BACKGROUND**

**I.   Plaintiff's Injury**

Amtrak employed plaintiff as an electrician.  (Am. Compl. at
¶ 8; dkt. entry no. 32, Fedyna Decl., Ex. E, Simoes Dep. at
54:22-55:4.)  On September 22, 2008, while moving a cooler full
of ice, he slipped and fell on a wet surface in the lunchroom of
the facility and suffered personal injuries to his back and neck.
(Id. at ¶¶ 9-10.)

There is no dispute that it was well-known to both Amtrak
and CCC personnel that the lunchroom floor near the ice machine
was chronically wet and slippery.  (Dkt. entry no. 32, Amtrak
Stmt. Facts at ¶¶ 8-10; dkt. entry no. 34, CCC Resp. to Amtrak
Stmt. Facts ("CCC Resp. Stmt.") at ¶¶ 8-10; dkt. entry no. 34,

---

[1] CCC also asserts cross-claims for contribution and "for
indemnity pursuant to both contractual and common law principles
against all other parties herein."  (Dkt. entry no. 21, CCC Ans.
& Cross-cl.)

CCC Supp'l Stmt. Facts ("CCC Supp'l Stmt.") at ¶¶ 2, 8-9, 11-13;
dkt. entry no. 34, Coyne Cert., Ex. 1, McPartland Dep. at 30:11-
24 (testimony of plaintiff's supervisor that "everybody" in
plaintiff's "gang" had "at some point complained about" the
slippery and wet conditions of the lunchroom floor).)  CCC has
pointed to testimony indicating a possibility that plaintiff's
injury was caused due to slipping on ice that he himself caused
to be on the floor.  (CCC Supp'l Stmt. at ¶ 6 (citing testimony
of plaintiff's co-worker, who was present during the incident,
that he "never observed any ice on the floor until . . . after
the plaintiff had fallen").)  This testimony may or may not be
consistent with plaintiff's recollection that there was water on
the floor when he first entered the lunchroom on the day of the
incident.  (Simoes Dep. at 115:4-117:12.)  As plaintiff explained
it, the floor was wet because pieces of ice had melted.  (Simoes
Dep. at 119:2-120:2, 123:9-124:14.)

## II.  Relationship Between Amtrak and CCC

CCC was engaged by Amtrak to provide janitorial and
maintenance services at the facility at the time of the incident.
(Am. Compl. at ¶ 7.)  CCC's agreement with Amtrak was to perform
this janitorial work on Mondays, Wednesdays, and Fridays.  (CCC
Resp. Stmt. at ¶ 3; Amtrak Stmt. Facts at ¶ 3; Fedyna Decl., Ex.
B, Purchase Order at 10.)  September 22, 2008, was a Monday.
(Amtrak Stmt. Facts at ¶ 5.)  The timesheet of the CCC janitor

assigned to the facility shows that he was there from 7:00 a.m. to 11:00 a.m. on the day of the incident.  (Amtrak Stmt. Facts at ¶ 14 & Fedyna Decl., Ex. J.)

Amtrak contends that it had a "Purchase Order contract" with CCC at the time of the incident providing that CCC would, inter alia, (1) clean, sweep, and mop the floors; (2) keep the grounds clean, neat, and presentable; (3) post notices; (4) provide minor maintenance and/or repairs as needed; (5) monitor the facility for maintenance and repair issues; and (6) notify Amtrak of any problems.  (Amtrak Stmt. Facts at ¶ 2; Purchase Order at 4-5; but see CCC Resp. Stmt. at ¶ 2 (observing that "Statement of Work" in Purchase Order also contained requirements not applicable to the facility insofar as the facility is for maintenance only and does not accommodate rail passengers).)  The Purchase Order, identified as Purchase Order No. S 060 14164, was first issued on March 11, 2005, and revised as of May 16, 2008 to "extend [the] contract period at same terms and conditions through 12/31/08." (Purchase Order at 10.)  It provided that Amtrak would pay $1,395.00 per month for the services detailed therein.  (Id.)

The Purchase Order contains an indemnification provision stating:

> The contractor [CCC] agrees to defend, indemnify and
> hold harmless Amtrak, its officers, directors,
> employees, agents, servants, successors, assigns and
> subsidiaries, irrespective of any negligence on their
> part, from and against any and all losses and
> liabilities, . . . claims, causes of action, suits,

4

       costs and expenses incidental thereto (including cost
       of defense and attorney's fees), which any or all of
       them may hereafter incur, be responsible for or pay as
       a result of injury . . . to any person . . . arising
       out of or in any degree directly or indirectly caused
       by or resulting from activities of or work performed by
       the contractor, contractor's officers, employees,
       agents, servants, subcontractors, or any other person
       acting for or by permission of the contractor.

(Purchase Order at 7.)

       Each page of the Purchase Order states that the Purchase

Order is "subject to the terms and conditions as detailed in NRPC

Form 69 revised 8/91."  (Purchase Order at 1-11; Fedyna Decl.,

Ex. C, NRPC Form 69.)  NRPC Form 69, "Conditions of Purchase,"

states in relevant part:

       1.  DEFINITIONS— . . . "Company" means the addressee of this
       Purchase Order. . . .

       2.  ACCEPTANCE— Acceptance of the offer represented by this
       Purchase Order is expressly limited to the terms hereof, and
       is accomplished by signing the acknowledgment of this
       Purchase Order and returning same to Amtrak <u>or by initiating
       performance of this Purchase Order</u>. . . .

       19.  LAWS, REGULATIONS AND PERMITS— . . . This Order will be
       interpreted in accordance with Section 306(d) of the Rail
       Passenger Service Act (Public Law 91-518) which requires
       that all leases, contracts and purchase orders entered into
       by the National Railroad Passenger Corporation be governed
       by the laws of the District of Columbia.

       29.  WORK ON AMTRAK'S PREMISES— If Company's work under this
       order involves operations by Company on the premises of
       Amtrak, Company shall take all necessary precautions to
       prevent the occurrence of any injury to persons or property.
       . . .

(NRPC Form 69 at ¶¶ 1, 2, 19, 29 (emphasis added).)

CCC contends that "no formal written contract" existed as between it and Amtrak, because the Purchase Order was never signed by any representative of CCC and contains "boilerplate" language not applicable to the work performed at the facility. (CCC Br. at 2.)  In the alternative, CCC states that assuming that the Purchase Order does constitute a contract between the parties, it is so vague and ambiguous as to be unenforceable as to all terms therein, including the indemnification provisions relied on by Amtrak.  (Id.)  CCC argues that if the indemnification provisions are enforceable, there is a genuine issue of material fact as to whether the incident "arose out of," "resulted from," or was "caused by" the work performed by CCC at the facility.  (Id. at 3.)

## DISCUSSION

### I.   Applicable Legal Standards

#### A.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v.

6

<u>Carlisle HMA, Inc.</u>, 554 F.3d 88, 94 (3d Cir. 2009) (citing

<u>Abramson v. William Patterson Coll.</u>, 260 F.3d 265, 276 (3d Cir.

2001)).

    **B.    Choice of Law**

    NRPC Form 69 contains a choice-of-law provision stating that

the Purchase Order "will be interpreted in accordance with

Section 306(d) of the Rail Passenger Service Act (Public Law 91-

518) which requires that all leases, contracts and purchase

orders entered into by the National Railroad Passenger

Corporation be governed by the laws of the District of Columbia."

(NRPC Form 69 at ¶ 19.)  Thus, Amtrak contends that District of

Columbia law governs its cross-claim for contractual indemnity,

while noting that the legal standard for formation of a binding

contract is essentially the same in both the District of Columbia

and New Jersey.  (Dkt. entry no. 37, Amtrak Reply Br. at 3, 16.)

CCC urges the Court to apply the substantive law of New Jersey,

"under general rules pertaining to the location where an

agreement is made, where the work is to be done and where the

injury [occurred]."  (CCC Br. at 17.)

    Federal courts exercising diversity or supplemental

jurisdiction over state law claims must apply the choice-of-law

rules of the forum state in determining which state's substantive

law applies.  See <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S.

487, 496-97 (1941); <u>Chin v. Chrysler LLC</u>, 538 F.3d 272, 278 (3d

Cir. 2008).  "Ordinarily, when parties to a contract have agreed

to be governed by the laws of a particular state, New Jersey

courts will uphold the contractual choice if it does not violate

New Jersey's public policy."  Instructional Sys., Inc. v.

Computer Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992) (citing

Restatement (Second) of Conflict of Laws § 187 (1969) (stating

that law of the chosen state will apply unless (a) the chosen

state has no substantial relationship to the parties or the

transaction and there is no reasonable basis for the parties'

choice, or (b) application of the chosen law would violate the

public policy of a state with a materially greater interest than

the chosen state)); accord Fashion Brokerage Int'l, LLC v. Jhung

Yuro Int'l, LLC, No. 10-746, 2011 WL 976478, at *4 n.2 (D.N.J.

Mar. 14, 2011).

We find that application of the contractual choice-of-law

provision is appropriate here.  There is no question that there

is a reasonable basis for the selection of District of Columbia

law, as Amtrak is incorporated and has its principal place of

business in the District of Columbia.  49 U.S.C. § 24301(b);

Cevasco v. Nat'l R.R. Passenger Corp., 606 F.Supp.2d 401, 408

(S.D.N.Y. 2009).  That the choice-of-law provision in NRPC Form

69 refers to a provision of the Rail Passenger Service Act, Pub.

L. No. 91-518, 84 Stat. 1327 (1970), that has since been repealed

by the Amtrak Reform and Accountability Act of 1997, Pub. L. No.

105-134, 111 Stat. 2570 (1997), is of no moment.  (CCC Br. at 19; dkt. entry no. 32, Amtrak Br. at 17.)  The contract language is not contingent on the continued validity of the statute that, prior to 1997, provided that "the laws of the District of Columbia govern leases and contracts of Amtrak, regardless of where they are executed."  Pub. L. No. 105-134, § 106(b), amending 49 U.S.C. § 24301(f).  Rather, NRPC Form 69, which clearly states that it was last revised in August 1991, expresses an intent that the contract be governed by the law of the District of Columbia, to which the parties assented by continuing to use that document as part of the contract even after the 1997 change to the law.  (NRPC Form 69 at ¶ 19; Amtrak Reply Br. at 16.)  See Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp., 305 F.Supp.2d 85, 88-89 (D.D.C. 2004) (applying District of Columbia law to claims for breach of contract and promissory estoppel against Amtrak by provider of janitorial services, pursuant to paragraph 19 of NRPC Form 69, where Purchase Order contract was entered into in 1999 and contract was to be performed in Maryland).

Because we determine, for reasons discussed below, that the Purchase Order and NRPC Form 69 constitute a contractual agreement between the parties under either New Jersey or District of Columbia law regarding contract formation, and in any event a conflict between the two would be moot due to federal preemption

of state laws restricting the enforceability of indemnification agreements entered into by Amtrak, there is no choice-of-law issue to be resolved; we will apply the choice-of-law provision selecting District of Columbia law.  Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994); Schwartz v. Hilton Hotels Corp., 639 F.Supp.2d 467, 471 (D.N.J. 2009).

## II.  Analysis

### A.    Contract Between Amtrak and CCC

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 608 A.2d 280, 284 (N.J. 1992) (quoting W. Caldwell v. Caldwell, 138 A.2d 402, 410 (N.J. 1958)). Similarly, under the law of the District of Columbia, "[a] contract is formed when there is an offer, an acceptance, and valuable consideration," Dixon v. Midland Mortg. Co., 719 F.Supp.2d 53, 57 (D.D.C. 2010), and must be "sufficiently definite as to its material terms . . . that the promises and performance to be rendered by each party are reasonably certain," Rosenthal v. Nat'l Prod. Co., 573 A.2d 365, 370 (D.C. 1990).  A signed writing "is not essential to the formation of a contract." Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995).

CCC's argument that the Purchase Order cannot constitute the memorialization of the agreement between the parties wherein CCC

agreed to provide janitorial services to Amtrak in exchange for

payment is specious.  CCC primarily suggests that the Purchase

Order is not a contract because it lacks a signature by a

representative of CCC that would manifest CCC's assent to the

terms therein.  (CCC Br. at 7.)  We find no statutory basis for

requiring such a writing.  The Purchase Order is not a contract

for a sale of goods and therefore is not subject to the

provisions of the Uniform Commercial Code requiring a written

contract for the sale of goods over $500.  N.J.S.A. § 12A:2-201;

D.C. Code § 28:2-201.  New Jersey's statute of frauds does not

require a writing for service contracts involving $100,000 or

less; no version of the Purchase Order ever involved this much

money.  (Purchase Order at 10; dkt. entry no. 37, Clauson Decl.,

Exs. B, C, D, F.)  See N.J.S.A. § 25:1-5.  The District of

Columbia's statute of frauds applies to contracts not to be

performed within one year, but here it is undisputed that the

Purchase Order in effect at the time of the incident was issued

on May 16, 2008, and by its terms would expire on December 31,

2008, such that no writing "signed by the party to be charged"

was required.  (Clauson Decl. at ¶¶ 14-15.)  See D.C. Code § 28-

3502.[2]  Because no statute of frauds is applicable here, we

examine whether the parties manifested an intention to be bound

---

[2] No previous versions of the Purchase Order provided for
services to be performed for a period exceeding one year.  (See
Clauson Decl. at ¶¶ 10-12.)

by performance of their respective obligations under the Purchase
Order.

Part performance of a party's obligation under a contract is
evidence of an intent to be bound under either New Jersey or
District of Columbia law.  See Davis, 664 A.2d at 838 ("When the
parties to a contract set forth the terms of their agreement in
writing and manifest in some manner a clear intent to be bound,
the absence of one party's signature on the written agreement
will not defeat or invalidate the contract."); Weichert Co.
Realtors, 608 A.2d at 284 ("[I]f parties agree on essential terms
and manifest an intention to be bound by those terms, they have
created an enforceable contract.").  NRPC Form 69, incorporated
by reference in the Purchase Order, expressly provides that
acceptance of the Purchase Order "is accomplished by . . .
initiating performance of this Purchase Order."  (NRPC Form 69 at
¶ 2.)  There is no dispute that (1) CCC provided janitorial
services at the facility three times a week, as specified in the
contract; and (2) Amtrak paid CCC in accordance with the
contract.  (Clauson Decl. at Ex. J, Amtrak Accounts Payable
Records.)

We find CCC's attempts to characterize its arrangement with
Amtrak as an "informal agreement" rather than one memorialized in
the Purchase Order unavailing.  (CCC Br. at 7.)  Amtrak has
adduced evidence showing that CCC contacted Amtrak in both 2005

12

and 2008 to request a current Purchase Order after the previous

one expired.   The original version of the Purchase Order,

effective March 11, 2005, was issued at the request of CCC.

(Clauson Decl., Ex. A, 2-28-05 Fax from CCC to Amtrak (requesting

"renewal of Purchase Order" for janitorial services at the

facility).)   The revised version of the Purchase Order in effect

at the time of the incident was also issued at the request of

CCC.   (CCC Supp'l Stmt. Facts at ¶ 15; Clauson Decl. at ¶¶ 7-16 &

Ex. E, Fax from CCC to Amtrak dated 5-16-08 (advising that

Purchase Order No. S 060 14164 had expired on 4-30-08 and CCC was

"discontinuing services until we received [sic] a new Purchase

Order").)   These actions constitute a manifestation of an

intention to be bound by the terms of the Purchase Order.

See Davis, 664 A.2d at 838.

     We also find that the terms of the Purchase Order are

sufficiently definite that "the performance to be rendered by

each party can be ascertained with reasonable certainty."   W.

Caldwell, 138 A.2d at 410; see also Rosenthal, 573 A.2d at 370.

Any complaint by CCC that the Purchase Order and NRPC Form 69

contain "boilerplate fine print" or vague language, or terms

inapplicable to a non-passenger maintenance facility, is moot in

light of CCC's repeated requests that Amtrak reissue the Purchase

Order in 2005 and 2008 to reflect the respective obligations of

the parties, without requesting that any changes be made to the

Purchase Order as written, as well as CCC's performance under the Purchase Order during that time.  (CCC Br. at 13.)  <u>See</u> Restatement (Second) of Contracts § 247 (1969) (stating that acceptance of part performance notwithstanding the non-occurrence of a condition "operates as a promise to perform in spite of a subsequent non-occurrence of the condition").

To the extent CCC contends the indemnification provision of the Purchase Order Amtrak seeks to enforce against CCC conflicts with a separate and non-identical indemnification provision in NRPC Form 69, we agree with Amtrak that no conflict exists that would render the Purchase Order indemnification unenforceable. NRPC Form 69 expressly provides that in the event of such an apparent inconsistency, the provisions of the Purchase Order take precedence.  (CCC Br. at 13; Amtrak Br. at 11; NRPC Form 69 at ¶ 2.)

**B.    Enforceability of Purchase Order Indemnity Clause**

CCC contends that state law "may reasonably restrict indemnification provisions" such as the one sought to be enforced here, and asserts that New Jersey law requires an agreement to indemnify a party for that party's own negligence be "expressed in unequivocal terms."  (CCC Br. at 15, 21 (citing <u>Ramos v. Browning Ferris Indus.</u>, 510 A.2d 1152, 1159 (N.J. 1986)).)

Although CCC goes to great lengths to explain why New Jersey law applies to the enforceability of the indemnification

provision, any choice-of-law analysis is moot with respect to this issue.  (CCC Br. at 17-20.)  First, the Court has already determined that the contract between the parties contains a valid choice-of-law provision identifying the District of Columbia as supplying the governing law with respect to the contract.  More importantly, any state law that would interfere with Amtrak's ability to allocate financial responsibility for claims against it is preempted by federal law.  Deweese v. Nat'l R.R. Passenger Corp., 590 F.3d 239, 250-51 (3d Cir. 2009); O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 162-63 (2d Cir. 2008).

The Amtrak Reform and Accountability Act of 1997 includes a provision stating that "[a] provider of rail passenger transportation may enter into contracts that allocate financial responsibility for claims."  49 U.S.C. § 28103(b).  The Deweese court observed:  "A plain reading of that single sentence reveals that the Act grants Amtrak power to enter into binding contracts that allocate financial responsibility for claims against it." 590 F.3d at 246.  The preemptive scope of this provision is broad, as "the goal of the Reform Act was to shield all of Amtrak's indemnity arrangements from legal attacks on their validity."  O & G Indus., 537 F.3d at 162.  Thus, regardless of whether CCC were to argue that the indemnity clause is unenforceable under either New Jersey or District of Columbia law, such argument fails in the face of 49 U.S.C. § 28103(b).

15

See Deweese, 590 F.3d at 250 (observing that the Reform Act was intended to preempt such state laws and to supersede Nat'l R.R. Passenger Corp. v. Consol. Rail Corp., 698 F.Supp. 951 (D.D.C. 1988) (overruled on other grounds), "which held that an indemnification agreement between Amtrak and ConRail violated District of Columbia public policy because it allowed indemnification in the context of gross negligence"); id. at 251 ("Congress intended with the passage of the Reform Act, and, more specifically, with the passage of § 28103(b), that all of Amtrak's indemnity agreements should be enforceable, regardless of the kind of conflicting state law that might be erected.").

Regardless of the preemption issue, CCC's argument that the indemnification provision is unenforceable because it does not "unequivocally express" an intention for it to indemnify Amtrak in the event of Amtrak's own negligence lacks merit.  (CCC Br. at 21.)  See Azurak v. Corporate Prop. Investors, 814 A.2d 600, 601 (N.J. 2003) (holding that to bring a negligent indemnitee within an indemnification agreement, "the agreement must specifically reference the negligence or fault of the indemnitee"); see also Rivers & Bryan, Inc. v. HBE Corp., 628 A.2d 631, 635 (D.C. 1993) (requiring a "clear intention . . . from the face of the contract" that indemnification for indemnitee's negligence was contemplated).  The Purchase Order explicitly states that the "Contractor" (CCC) "agrees to defend, indemnify, and hold

16

harmless Amtrak, its officers, directors, employees, agents,
successors, assigns and subsidiaries, <u>irrespective of any
negligence on their part</u>."   (Purchase Order at 7 (emphasis
added).)   The indemnity agreement in <u>Azurak</u>, by comparison,
lacked any such reference to the possible negligence of the
indemnitee and is therefore distinguishable.  814 A.2d at 600.
We find that the Purchase Order unequivocally expresses an
intention of the parties for CCC to indemnify Amtrak even for
claims involving Amtrak's own negligence.  <u>See</u> <u>Cevasco</u>, 606
F.Supp.2d at 414 n.8.

      **C.**    **Whether Incident Falls Within Indemnity Clause**

     CCC argues that there is a genuine issue of material fact as
to whether the incident "arose out of," "resulted from," or was
"caused by" the work of CCC, so as to fall within the indemnity
clause.  (CCC Br. at 9; Purchase Order at 7 (requiring CCC to
indemnify Amtrak for any liabilities "arising out of or in any
degree directly or indirectly caused by or resulting from
activities of or work performed by" CCC).)  Specifically, CCC
points to deposition testimony of plaintiff's coworker that the
coworker observed no ice on the floor prior to the incident, but
did see ice on the floor after the incident, such that it would
be reasonable to infer that plaintiff slipped on ice he had
caused to fall to the floor while transferring ice from the
machine to the cooler.  (CCC Br. at 10.)  CCC states that if a

jury were to reach such a conclusion, the incident could not be deemed to arise out of, be caused by, or result from "any work that CCC did, or didn't do, at the premises."  (Id. at 10-11.)

Amtrak "agrees that the jury could reasonably reach this conclusion and that, under that particular factual scenario, CCC would not be obligated to defend and indemnify Amtrak."  (Amtrak Reply Br. at 24.)  Amtrak therefore has modified the relief it seeks, and now, rather than outright ordering CCC to indemnify and defend Amtrak and to reimburse Amtrak for its attorneys' fees and costs incurred so far in defending the action, requests an order and judgment declaring, inter alia, that (1) the Purchase Order (a) is a contract that is binding on CCC, (b) is not unenforceable as vague or indefinite, and (c) requires CCC to defend and indemnify Amtrak for claims covered by its indemnity clause, even if Amtrak was negligent or at fault with respect to the incident; (2) if the jury determines at trial that CCC was negligent and that CCC's negligence caused plaintiff's accident to any degree, even 1%, CCC is required to indemnify Amtrak and reimburse it for its defense costs; and (3) if the jury determines at trial that CCC was not negligent or that its negligence was not the proximate cause of plaintiff's accident, that finding does not automatically relieve CCC of its indemnity obligation to Amtrak; rather, CCC shall indemnify Amtrak and reimburse its defense costs unless it is determined at trial that

plaintiff's accident (a) did not arise out of CCC's activities or work, and (b) was not in any degree directly or indirectly caused by or resulted from CCC's activities or work.  (Dkt. entry no. 37, Proposed Order.)

Having determined that the Purchase Order, including the indemnification clause, is binding and enforceable as to CCC, we find that summary judgment to that effect as to Amtrak's cross-claim for contractual indemnity is appropriate at this time. However, we decline to make any specific ruling at this juncture as to which circumstances or potential jury findings would trigger CCC's duty to defend and indemnify.  We think that determination is better reserved for such time after a jury makes findings of fact and allocates liability for the incident, particularly in light of Amtrak's recognition that the indemnification clause may ultimately not apply with respect to plaintiff's claims here and Amtrak's willingness to accept reimbursement of attorneys' fees and costs in lieu of CCC being ordered to provide a defense to Amtrak immediately.

**CONCLUSION**

For the reasons stated <u>supra</u>, the Court will grant in part
and deny in part Amtrak's motion for summary judgment.  The Court
will issue an appropriate Order.


                                        s/Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge


Dated:    May 26, 2011